MUS3715499.3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMARZA PRODUCTIONS, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 21-242 |
| | ) |
| vs. | ) |
| | ) |
| RYNO PICTURES, a division of RYNO PRODUCTION, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |
| <u>JURY TRIAL DEMANDED</u> | ) ELECTRONICALLY FILED |

**COMPLAINT IN CIVIL ACTION SEEKING REPLEVIN AND OTHER LEGAL RELIEF**

Plaintiff, Amarza Productions, by and through its legal counsel David G. Oberdick, Kate E. McCarthy and Meyer, Unkovic & Scott LLP, and files this Complaint in Civil Action Seeking Replevin and Other Legal Relief against Defendant, RYNO Pictures, a division of RYNO Production, Inc., averring as follows:

**THE PARTIES**

1. Amarza Productions ("Amarza") is a limited liability corporation organized under the laws of the State of Florida with a principal place of business at 17708 Simms Road, Odessa, Florida 33556.

2. RYNO Pictures, a division of Production, Inc. ("RYNO") is a corporation existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at 216 Pleasant Dive, Aliquippa, PA 15001.

## JURISDICTION AND VENUE

3. This Court has federal diversity jurisdiction over this matter, as this controversy arises between citizens of different states and involves an amount in controversy in excess of the jurisdictional threshold set forth at 28 U.S.C. § 1332.

4. Venue is proper in this Court by virtue of an agreement between the parties and because Defendant's place of business is within this judicial district.

## BACKGROUND

5. Amarza is an independent film production company.

6. Linda Martuch ("Ms. Martuch") is the general manager of Amarza.

7. Upon information and belief, RYNO is a full-service multimedia communications firm, which provides various services, including video production, editing and animation.

8. Upon information and belief, John Yost ("Mr. Yost") is a producer and senior sales executive at RYNO.

9. On July 27, 2019 Amarza and RYNO entered into a written agreement ("Agreement") under which RYNO agreed to provide production services for an approximately 90-minute documentary about human contact with non-human intelligence ("the Project"). A copy of the Agreement is attached to the Complaint as Exhibit A.

10. Mr. Yost, on behalf of RYNO, served as the producer, director and writer of the Project.

11. Mr. Yost also served as protagonist of the film, which documented his lifelong interest in extraterrestrial life that was sparked by a childhood encounter.

12. Under the Agreement, RYNO agreed to provide the following services on the Project beginning in July 2019, collectively "Production Services":

> Write the script under Client supervision, assistance and final approval;
> Serve as a liaison with attorney, E&O entity, and other insurance companies, Secure & maintain all permits, talent releases, music/photo/clip licenses; Catalogue and maintain all incoming world-wide footage and stills;
> Provide logistics & necessary travel for the Production team;
> Provide all necessary equipment, media and storage hard drives;
> Set photography for social media; record, film and documents all materials; Provide editing of all materials;
> Create SFX & motion graphics;
> Record narration for assembly & final versions;
> Provide all necessary sound engineering and appropriate music;
> Deliverables will be theatrical and broadcast level pursuant to The Orchard's requirements including metadata & Pro-Rez DCP files for theater screening; and Pitch for sale and distribution to The Orchard and other media outlets with whom Producer has contact.

(Ex. A, Art. 3.)

13. The reference to "The Orchard" in the Agreement is to a California distribution company of the same name, which, through acquisition, merger or renaming became 1091 Media ("1091").

14. In connection with the reference to "The Orchard requirements" in the Agreement, 1091 provided its own set of required deliverables to RYNO in connection with a prior film, and RYNO, in turn, provided them to Amarza. A copy of the Orchard Deliverables is attached to the Complaint as Exhibit B.

15. RYNO agreed to provide a finalized film approved for distribution by Amarza by May 31, 2020. (Ex. A, Art. 1(E).) Amarza agreed to extend this date because of the impact of the COVID pandemic.

16. The Agreement contains a "Warranties" provision, which states: "Producer represents and warrants that it will perform the Production Services using reasonable care and skill for a Producer in its field and that any end products or materials given by the Producer to the Client

under the terms and conditions of this Agreement will not infringe on or violate the intellectual property rights or any other right of any third party." (Ex. A, Art. 7.)

17. The Agreement provided a payment schedule under which Amarza was obligated to pay five installments of $100,000 upon the occurrence of certain specified production milestones. (Ex. A, Art. 4(A).)

18. Amarza made the first payment of $100,000 on July 27, 2019 upon execution of the Agreement.

19. Amarza made the second payment of $100,000 on or around August 30, 2019 after Amarza and RYNO collectively decided to transform the genre of the film into a true documentary, thereby making a formal script unnecessary.

20. Amarza made the third payment of $100,000 on or around April 3, 2020, upon representations from RNYO that shooting was completed.

21. Amarza later learned that some live footage and a considerable amount of BRoll still needed to be filmed. BRoll is supplemental video that is considered secondary to the primary footage and is generally inserted for the audience to watch while the narrator or interviewee is speaking.

22. Amarza made the fourth payment of $100,000 on or around July 7, 2020, following the complete assembly of the Project.

23. The fifth and final payment of $100,000 was due to be made once the "finalized Work has been approved for distribution by [Amarza]." (Ex. A, Art. 4(A).)

24. The Agreement defines "Work" as "the **completed** work product provided by the Producer to Client at the **completion** of the Project." (Ex. A, Art. 1(C) (emphasis added).)

-4-

25.     Amarza was obligated to "provide final approval of Script and Work prior to distribution" and "in the event that [Amarza] does not approve of the Script or Work, any all Client payment obligations tied to delivery of the Script or Work will be postponed until [RYNO] provides an approved Script and/or Work[.]"  (Ex. A, Art. 3.)

26.     The Agreement was a "work-made-for-hire" agreement, meaning that all work done by RYNO for Amarza would be "the sole and exclusive intellectual property of [Amarza]" and that Amarza would "maintain all rights to ownership, control, licensing, and exploitation of the Completed work."  (Ex. A, Arts. 3 and 5.)  The ownership of a "work-made-for-hire" is recognized under United States Copyright Law, 17 U.S.C. § 101.  In particular, where, as here, "the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire", and the work falls within one of nine listed categories – in this case, "a work specially ordered or commissioned for use ... as a part of a motion picture or other audiovisual work", then the author/principal is automatically considered as the author and owner of the work.

27.     Under the Agreement, RYNO was to facilitate distribution with 1091 or other distributors.

28.     Mr. Yost focused the marketing/distribution obligations of RYNO on 1091 in particular.  More specifically, during 2020, Mr. Yost entered into discussions with Jim Martin ("Mr. Martin"), who was then a Vice President at 1091.

29.     The Agreement also requires that "[Amarza and RYNO] will coordinate efforts for distribution of the Project and will decide collectively as to the acceptance of any distribution offer.  [Amarza and RYNO] further agree that acceptance of any offer to distribute the Project must be unanimous which agreement will not be unreasonably withheld."  (Ex. A, Art. 4.)

30. Throughout Mr. Yost's involvement in the Project and his communications with Mr. Martin regarding the film's distribution, Mr. Yost purposefully excluded Ms. Martuch from the discussions.

31. Further, RYNO repeatedly refused to relay Mr. Martin's direct comments to Amarza and instead only provided summaries of what Mr. Yost represented were Mr. Martin's proposed edits. Because Ms. Martuch was excluded from direct communications with Mr. Martin, she was, at all times, unclear of 1091's interest in, view of, specific comments upon, and any detailed proposal for distributing the film.

32. A third cut of the film was delivered to Amarza on or about April 4, 2020.

33. On or about May 28, 2020, Amarza provided RYNO with approximately seven pages of comments and suggested edits on the third cut of the film.

34. On or about June 17, 2020, during a conference call between Ms. Martuch, Mr. Yost, Jools Enticknap, who was also featured in the film and an associate producer, and various other principals and employees of Amarza and RYNO, Mr. Yost stated that he would not complete RYNO's obligation to facilitate distribution as required by the Agreement.

35. On or about June 26, 2020, RYNO delivered a fourth cut of the film, which incorporated some, but not all, of Amarza's May 28, 2020 comments.

36. Between June 28 and July 2, 2020, Ms. Martuch travelled to RYNO to participate in the editing process.

37. On or about July 2, 2020, Amarza verbally agreed that it was satisfied with the current version of edits with the understanding that more editing would be forthcoming when suggestions or requirements were obtained from distributors. At this time, RYNO did not provide Amarza with a "completed work product" for final review and approval.

38. Following this meeting, Amarza made the fourth payment of $100,000 on July 7, 2020, because, at this time, RYNO took the position that the Project was completely assembled even though credits were not included. At this time, the film was not a "finalized Work" that had been "approved for distribution" by Amarza as required by the Agreement. (Ex. A, Art. 4(A).)

39. Following any notes received from distributors, an additional round of edits would be necessary to produce a final version, which would then be subject to a sweetening process. Only after this sweetening process, would the film be in a finalized form ready for large-scale distribution.

40. In early July 2020, Amarza sought to retain a distribution consultant to replace Mr. Yost, who had ceased work on his distribution obligations under the Agreement, for the purpose of obtaining distribution assistance and distributor comments necessary to move the Project through this final editing phase.

41. On or about July 17, 2020, Ms. Martuch attempted to reach out to Mr. Martin at 1091 Media to secure his continued involvement in the Project, but she received no response.

42. Upon information and belief, throughout his involvement on the Project, Mr. Yost spoke negatively about Ms. Martuch to Mr. Martin resulting in Mr. Martin's refusal to engage with Ms. Martuch directly regarding the film's distribution.

43. On July 31, 2020, Ms. Martuch requested files documenting RYNO's work on the Project from RYNO for purposes of purchasing completion insurance, with the requested files specifically identified as "2 full copies of all work to date for archival storage as soon as possible." These files would, include, without limitation all (i) Permits, (ii) Talent and location releases, (iii) Music/photo/clip licenses, (iv) Call lists, (v) Shot lists, (vi) Shooting schedules, (vii) Camera

reports, (viii) Camera originals, (ix) Sound originals, (x) Project files, (xi) Color Correction files (if any), (xii) Sound mix files, (xiii) All stems and intermediary project files (roughs, stitches, previous versions), and (xiv) All other work documentation (collectively, "Project Files").

44. Over the course of RYNO's work on the Project, of these Project Files, Amarza was only ever provided with some shooting schedules, some behind the scenes social media stills, and a finished trailer, and Amarza also was shown some intermediary project files.

45. RYNO provided no formal process by and through which Amarza could approve or even review these various categories of Project Files.

46. RYNO responded the same day – July 31, 2020 – by sending an invoice to Amarza for the fifth and final installment payment. In the email transmitting the invoice, RYNO listed several deliverables that were not yet completed and were not subject to distributor comments, including color correction and finalizing the credit sequence, and RYNO stated that these deliverables would be finished at a later date following distributor changes and edits. These listed unfinished deliverables confirmed that, at this time, a "competed work product" did not exist.

47. On or about August 11, 2020, and as a result of Mr. Yost's refusal to fulfill RYNO's distribution consulting obligations under the Agreement, Amarza entered into a contract with Hybrid Cinema for distribution consulting.

48. On or about August 18, 2020, Amarza delivered a server to RYNO's facility for transfer of the Project Files. The value of this server is $3,000.

49. On August 31, 2020, RYNO sent Amarza a Notice of Default letter claiming that Amarza owed the fifth and final $100,000 payment for a version of the film that RYNO claimed Amarza approved for distribution. The letter also included a demand for an additional $3,011.25 for the backup of the Project Files, which RYNO claimed was outside the scope of the Agreement.

-8-

50. At the time RYNO sent the letter, a "completed work product" did not exist, the film was not "finalized . . . for distribution", and the Deliverables were not at a "theatrical and broadcast level" as required by the Agreement. (*See* Ex. A, Arts. 3 and 4(A).)

51. On or about September 1, 2020, Amarza retained New Doc Consultancy for story consultancy.

52. In early September, Amarza received comments and suggested edits from both Hybrid Cinema and New Doc Consulting.

53. Many of the issues identified by Hybrid Cinema and New Doc Consulting were similar to those identified by Amarza in its May 28, 2020 letter to RYNO.

54. Between May 28, 2020 and the present day, and in violation of Article 3 of the Agreement, RYNO has refused to address or rectify all of these issues.

55. Rather, upon information and belief, and without Amarza's consultation or consent, RYNO made a unilateral decision to take steps to finalize the film, including some sweetening.

56. Upon information and belief, RYNO also took these unauthorized steps without soliciting or incorporating distributor requested edits.

57. Amarza did not receive notice from RYNO that it was proceeding without distributor input.

58. The changes recommended by New Doc Consulting were provided to RYNO by Amarza, and RYNO refused to implement these changes. These changes would dramatically improve the success and profitability of the film.

59. Amarza has not approved a finalized film that is ready for distribution.

60. In violation of the Agreement's clause that Amarza consent to any distribution deal, RYNO claims to have secured a distribution deal with 1091 in September 2020, but, despite

numerous requests, RYNO has repeatedly refused to provide Amarza with the financial and other details of the alleged 1091distribution offer.

61. In addition, RYNO has not provided any details of what work was done and/or how RYNO has spent budgeted dollar amounts on marketing of the film for disribution.

62. On numerous occasions, Amarza has requested that RYNO return the Project Files and the server.

63. RYNO has refused to release any Project Files or return the Amarza server, which are the sole and exclusive property of Amarza, to Amarza.

64. Certain Project Files that RYNO is unlawfully retaining, including permits, talent and location releases, music/photo/clip licenses, and E&O insurance, are necessary for Amarza to present to other distributors in order to obtain a distribution deal.

**COUNT I – ANTICIPATORY BREACH OF CONTRACT**

65. Plaintiff incorporates the preceding Paragraphs of its Complaint as if the same were fully set forth at length herein.

66. Under the express terms of the Agreement, RYNO was obligated to provide a "completed work product" and facilitate distribution of the film.

67. Despite these contractual obligations, RYNO, has not presented a "completed work product" to Amarza for final review and approval. Instead, RYNO issued a final invoice and sent a subsequent Notice of Default seeking to extort payment for an unfinished film.

68. In addition, RYNO, through Mr. Yost, declared that it would not fulfill its obligations to facilitate distribution.

69. RYNO also has failed to solicit distributor comments and incorporate the comments received by Amarza's selected consultants into the Project.

70. Defendant has absolutely and unequivocally refused to perform its obligations under the Agreement.

71. An anticipatory breach of a contract occurs whenever there has been a definite and unconditional repudiation of a contract by one party communicated to another.

72. A statement by a party that he will not or cannot perform in accordance with an agreement creates such a breach.

73. Upon information and belief, Amarza will incur more than $100,000 to finalize the film and obtain a completed work product. As such, RYNO has been overpaid for the work done to date on the Project.

74. Further, because RYNO has refused to provide Project files to Amarza for review, Amarza believes, and therefore avers, that RYNO has failed to complete other required Deliverables.

75. As a result of RYNO's breach, Amarza was required to expend additional money to retain different consultants to perform work that RYNO was obligated to provide.

76. As a result of RYNO's breach, RYNO has caused a delay in the production and distribution schedule of the Project.

77. As a result of RYNO's breach, Amarza will additionally incur future expenses necessary to finalize the film and prepare it for distribution.

WHEREFORE, Plaintiff Amarza Productions respectfully requests judgment in its favor against Defendant RYNO Production, Inc. for (i) a declaration that the Production Agreement has been breached by RYNO and therefore is invalidated such that Amarza owes no further compensation and obligations to the RYNO under the Production Agreement, and (ii) damages in

excess of the jurisdictional threshold of 28 U.S.C. § 1332, plus court costs, reasonable attorneys' fees, and any other legal and equitable remedies as this court deems appropriate.

## COUNT II - CONVERSION

78. Plaintiff incorporates the preceding Paragraphs of its Complaint as if the same were fully set forth at length herein.

79. Despite repeated requests by Amarza, RYNO has refused to return the Project Files and the Amarza server to Amarza.

80. Under the express terms of the Agreement, the Project Files and server are the sole and exclusive property of Amarza.

81. The actions of RYNO as aforesaid have interfered with Amarza's use and possession of said property.

82. The actions of RYNO as aforesaid have deprived Amarza of said property without consent or lawful justification for doing so, and thereby constitute acts of conversion.

WHEREFORE, Plaintiff Amarza Productions respectfully requests judgment in its favor against Defendant RYNO Production, Inc. for (i) a declaration that the Production Agreement is invalidated such that Amarza owes no further compensation and obligations to the RYNO under the Production Agreement, and (ii) damages in excess of the jurisdictional threshold of 28 U.S.C. § 1332, plus court costs, reasonable attorneys' fees, and any other legal and equitable remedies as this court deems appropriate.

## COUNT III – REPLEVIN

83. Plaintiff incorporates the preceding Paragraphs of its Complaint as if the same were fully set forth at length herein.

84. On or about July 27, 2019, Amarza and RYNO entered into the Agreement.

85. Pursuant to the Agreement, all work done by RYNO for Amarza, the Project Files, remained the sole and exclusive intellectual property of Amarza and that Amarza would maintain all rights, ownership, control, licensing, and exploitation of the completed work. (Ex. A, Arts. 3 and 5.)

86. Additionally, Amarza provided RYNO with a server onto which RYNO transferred the Project Files.

87. Amarza has made demands upon RYNO to surrender and deliver possession of the Project Files and the server to Amarza.

88. Despite repeated demands, RYNO has refused, and continues to refuse, to return the Project Files and the server to Amarza.

89. The estimated current value of the withheld Project files and server is, at most, $103,000.00.

90. Amarza seeks an entry of judgment for replevin.

WHEREFORE, Plaintiff Amarza Productions respectfully requests that this Court enter judgment in its favor and against RYNO Productions, Inc. for the following:

    A. Amarza is entitled to immediate possession of the Project Files and server, as more particularly described herein;

    B. Special damages sustained as a result of RYNO's wrongful conduct in an amount to be determined at the time or trial or hearing;

    C. Costs of suit and such other relief as this Court deems just and proper.

**JURY TRIAL DEMANDED**

Respectfully submitted,


By: */s/ David G. Oberdick*
David G. Oberdick, Esquire
PA I.D. #47648
dgo@muslaw.com

Kate E. McCarthy
PA I.D. #325771
kem@muslaw.com

Meyer, Unkovic & Scott LLP
Henry W. Oliver Building
535 Smithfield Street, Suite 1300
Pittsburgh, PA 15222-2315
(412) 456-2800
(412) 456-2864/Fax

ATTORNEYS FOR PLAINTIFF AMARZA PRODUCTION